DEWARD D. EDWARDS and DORIS EDWARDS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Edwards v. Commissioner
Docket Nos. 3165-72, 4280-72.
United States Tax Court
T.C. Memo 1973-252; 1973 Tax Ct. Memo LEXIS 37; 32 T.C.M. (CCH) 1186; T.C.M. (RIA) 73252; November 20, 1973 Filed W. D. Girand, for the petitioners. David L. Jordan, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1967, 1968, 1969, and 1970 in the amounts of $272.01, $1,136.28, $219.01, and $1,682,51, respectively. The sole issue remaining for decision is the value of certain real property contributed by petitioners to a church on May 19, 1967. 2 FINDINGS OF FACT Petitioners Deward D. Edwards and Doris Edwards, husband and wife, were legal residents of Midland, Texas, at the time they filed their petitions. They filed their joint income tax returns for the years 1967, 1968, 1969, and 1970 with the district *38 director of internal revenue, Dallas, Texas. As of January 1, 1956, at the time of the assessment of the 1956 real property taxes by the State of New Mexico, Cecil B. Stracener owned a 150-foot-by-175-foot rectangular tract of land (hereinafter referred to as "the lot," "the Stracener lot," or "the property") located in Hobbs, Lea County, New Mexico. The lot is bounded on the south and west sides by real estate (hereinafter "the church property") owned by the Northside Baptist Church of Hobbs, New Mexico ("the church"), on which the principal church building is located, and on the north and east sides by an alley and a street. The lot and the church property together form a rectangular tract of land, 305 feet by 300 feet. The Stracener lot is located in the northeast corner of this rectangular tract. On June 11, 1956, Stracener and his wife conveyed the lot to Colonial Homes, Inc., and by deed dated December 31, 3 1958, Colonial Homes, Inc., conveyed its interest in the lot to the church. On March 24, 1965, the church authorized the preparation of architectural plans for a classroom building which would connect to the existing church building and extend over onto the *39 Stracener lot. The building, a 2-storied, flat-roofed, concrete block construction of conventional design, was completed in 1965 at a cost of $105,195. It houses classrooms of the church school and the administrative offices of the church. Of the total 6,630-square-foot area covered by the building, 5,100 square feet are on the Stracener lot. All the plumbing, gas, and sewer lines and electrical mains are located in the portion of the building which is on the church property. The air-conditioning units and most of the air ducts are in the portion of the building on the Stracener lot. At the time Stracener conveyed the lot to Colonial Homes, Inc., the ad valorem taxes on the lot had not been paid. Thereafter, on January 18, 1958, the County Treasurer of Lea County sold the property to the State of New Mexico for back taxes. The sale was completed more than 11 months prior to the date on which Colonial Homes, Inc., conveyed its interest in the property to the church. Whether Colonial 4 Homes, Inc., or the church was aware of the tax sale is not conclusively shown in the record. After the 2-year period of redemption authorized by the laws of the State of New Mexico had *40 expired, the County Treasurer of Lea County executed a tax deed dated January 18, 1960, to the State of New Mexico. Thereafter, the State Tax Commission of New Mexico advertised the lot for sale, and petitioners submitted the bid which was accepted. On June 10, 1966, the State Tax Commission of New Mexico conveyed the property to petitioners as joint tenants with right of survivorship, for the stated consideration of $210. By virtue of the deed from the State Tax Commission of New Mexico, petitioners were the legal owners of the lot, together with the portion of the church classroom building which was then located on the lot. At the time petitioners submitted their bid and received their deed from the State Tax Commission of New Mexico, they mistakenly thought the lot they had acquired was located across the street from the church building. Subsequently, after they learned the true location of the lot, petitioners made at least two offers to sell the property to the church. The first offer was made by a letter dated February 25, 1967, in which petitioners offered to 5 convey the property to the church for the sum of $6,500. By letter dated May 17, 1967, the church did not *41 accept the $6,500 offer but made a counteroffer to reimburse petitioners for the amount that they had invested in the property and any other incidental expenses which they might have incurred. The church also invited petitioners to a business metting for a public discussion of the matter. The second offer which petitioners made to the church was to convey the property to the church in return for the church's buying and conveying another parcel of property to petitioners. Petitioners did not offer, and did not consider offering, to sell the lot to anyone other than the church. On May 19, 1967, after some urging by members of the church, petitioners made a gift of the lot to the church by quitclaim deed. In their 1967 income tax return, petitioners claimed a charitable contribution of $282,996. This figure was based on an appraisal which covered not only the property which petitioners had conveyed to the church but, in addition, the property on which the main church building was located. In their 1968, 1969, and 1970 income tax returns, petitioners claimed a carryover of the portion of the contribution deduction not used in the prior year or years. 6 In the notices *42 of deficiency, respondent determined that the fair market value of the real property interest contributed to the church was $500. However, based on a later appraisal by an expert witness, respondent now concedes that petitioners are entitled to a charitable contribution deduction in the amount of $21,400. ULTIMATE FINDING OF FACT The fair market value of the lot and the portion of the building located on the lot as of May 19, 1967, was $45,000. OPINION Respondent concedes that during 1967 petitioners made a charitable contribution of the subject property within the meaning of section 170(a). [1] The regulations provide that if a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the donated property. Sec. 1.170-1(c) (1), Income Tax Regs. Accordingly, the sole issue is the fair 7 market value of the Stracener lot plus that portion of the classroom building situated thereon at the date of the gift. In exercising our judgment as to the value of the donated property, *43 the controlling criterion is the price at which, on the date of the gift, the lot plus improvements would have changed hands "between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170-1(c) (1), Income Tax Regs.; Tracy v. Commissioner, 53 F.2d 575, 577 (C.A. 6, 1931), certiorari denied 287 U.S. 632 (1932). The fair market value of property at any given date is a question of fact to be decided in the light of all the evidence, and no set rules, methods, or formulae are controlling. Newaygo Portland Cement Co., 27 B.T.A. 1097, 1106 (1933), affd. 77 F.2d 536 (C.A.D.C. 1935). The parties have presented the testimony of three expert witnesses, two for petitioners and the other for respondent. One of petitioners' experts arrives at a value of $78,168 by ascribing to petitioners' property a portion ($74,868) of the total cost ($105,195) of constructing the 1965 addition to the church building. The appraisal adds 8 another $3,300 [2] to reflect the cost of separating the portion of the builing on the lot from the church-owned *44 portion. The other appraisal arrives at a value of $81,868, allocating $7,00 to the land and $74,868 for the building. Respondent's witness starts with an estimate of $94,000 as the value of a lot and building separated from the church building and remodeled as an office building. He then estimates the cost of remodeling at $72,605, [3] arriving at a total "Indicated Value of Shell Building & Land" of $21,400. This appraisal estimates the value of the lot without the building at $7,875, taking into account the sales of similar property and making appropriate adjustments. Respondent's concession that petitioner is entitled to a deduction of $21,400 is based on this appraisal. We doubt that the traditional guidelines for appraising real estate *45 espoused by the American Institute of Appraisers 9 and other similar organizations provide much help in this bizzare factual situation. Those guidelines were hardly developed for valuing a city lot improved by a church building wing with no electrical mains and no plumbing, gas, or sewer lines, but containing the air-conditioning units and air ducts serving a portion of the church building. Ordinarily, the price paid for a piece of property near the valuation date provides some guidance, but that is hardly true of the tax delinquency sale in which petitioners acquired this property. Also, an offer of sale will usually reflect the owner's judgment as to the value of his property.But petitioners' $6,500 offer to the church was made in pursuit of an effort to salvage approximately the amount he could have realized from the sale of a vacant lot. [4] Consequently, our path to the hypothetical price at which the subject property would change hands between a willing seller and a willing buyer is largely uncharted. Conversion of the building *46 to commercial use obviously would have entailed major outlays. Respondent's witness places those costs at $72,605. While we think that figure 10 is excessive, the cost clearly would have exceeded the $3,300 suggested by petitioners' witness as the expenditure needed for separating the portion of the building on the lot from the church-owned portion. Moreover, even if this conversion had been made, the rentability of the space would have been affected by the building's proximity to the remainder of the church plant and the attitudes of the members of the local community. Before petitioners made their gift, the Pastor of the church wrote a letter, dated May 17, 1967, imploring petitioners to convey the property to the church. The letter stated, among other things, that the news of petitioners' ownership of the lot "spread like wildfire through our town," causing problems which impeded the work of the church and became "an item of discussion from beauty shop to barber shop." These public relations and social pressure problems almost certainly would have carried over to any landlord or tenant managing or occupying the property. Such problems would have affected the price at which *47 the property could have been sold. The most economical use for the property, of course, was the use for which it was constructed - as a part of the church building to house classrooms and the administrative offices. In arranging a sale for such use, both parties 11 would have negotiated with knowledge of the practical difficulties of devoting the property to any other use than the purpose for which the building was constructed and the approximate cost to the church of obtaining alternative facilities. We think the seller would have made concessions due to the limited uses for which the property was suitable and the practical problems involved in converting it to commercial use. Similarly, we think the buyer would have been conscious of the replacement cost of an alternative facility and the problems that would have been created by commercial occupancy of a wing of the church building. Taking into account the entire trial record, we find that the property had a fair market value of $45,000 on May 19, 1967. To reflect this finding, as well as other adjustments to which the parties have agreed, Decisions will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. ↩
2. Since the building is valued as if detached from the church-owned property, it would seem more logical to subtract, rather than add, the cost of effecting the separation. ↩
3. The remodeling expenses are broken down as follows: Partition wall $10,387; plumbing $11,200; utilities $1,548; electrical $6,120; and remodel interior $43,350. In arriving at the value of $21,400, the expert rounded the remodeling expenses at $72,600. ↩
4. It will be noted that the $6,500 offer roughly approximates the estimated value of the lot given by the appraisers ($7,000 and $7,875).↩